LAW OFFICES OF CARL M. VARADY

CARL M. VARADY 4873
American Savings Bank Tower
1001 Bishop Street, Suite 2870
Honolulu, Hawai'i 96813
Telephone 523-8447

ATTORNEY FOR PLAINTIFF

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

FEB 0 7 2006

at 4 o'clock and 49 min. P M
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| HITOMI NIHEI,<br><br>                    Plaintiff,<br><br>    vs.<br><br>THOMAS T.M. HO and DOE<br>ENTITIES 1-10,<br><br>                    Defendants. | CV04-00546 HG/KSC<br><br>PLAINTIFF'S PRE-TRIAL<br>STATEMENT; CERTIFICATE OF<br>SERVICE<br><br>Final Pre-trial Conference<br><br>Date: February 14, 2006<br>Time: 9:00 a.m.<br>Judge: Hon. Kevin S.C. Chang<br><br>TRIAL DATE: March 29, 2006<br><br>Judge: Hon. Helen Gillmor |

## PLAINTIFF'S PRE-TRIAL STATEMENT

Pursuant to Local Rule 16.6 of the United States District Court for

the District of Hawai'i, Plaintiff HITMOMI NIHEI submits this pre-trial

statement.   There has been reasonable time to complete substantial discovery and

the case is ready to be set for trial.

## A.  PARTIES.

Plaintiff: HITOMI NIHEI

Defendant: THOMAS HO

## B.  JURISDICTION AND VENUE.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1332(a)(2) and 1367, and venue in the Court is proper pursuant to § 28 U.S.C. § 1391, as Ms. Nihei's claims arose, the majority of defendants domiciled and the acts complained of occurred in the District of Hawai'i.

## C.    SUBSTANCE OF THE ACTION.

This action arises as a result of acts committed by Ho in 1998, during the period he was retained to provide professional legal services to Ms. Nihei and, in particular, to assist her in obtaining a preferred visa to permit her to reside in the United States.

## D.    UNDISPUTED FACTS.

1.    Ms. Nihei retained Defendant Ho in 1998 to provide professional legal services to her and, in particular, to assist her in obtaining a preferred visa to permit her to reside in the

United States.

2.    Defendant Ho was retained by Ms. Nihei to prepare a petition on her behalf for preferred visa status as an immigrant investor under § 203(b)(5) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1153(b)(5).

3.    In October 1990, Congress enacted § 203(b)(5) of the INA, which provides that an alien investor may qualify for preferred visa status if the alien is "seeking to enter the United States for the purpose of engaging in a new commercial enterprise," "which the alien has established," and "which will benefit the United States economy and create full-time employment for not fewer than 10 United States citizens" or lawful aliens. 8 U.S.C. § 1153(b)(5)(A) (1999).

4.    Because the immigrant investor program is the fifth preference in the "employment-based" visa preference category, it is commonly referred to as the "EB-5" program.

5.    The immigration statute imposed specific capitalization requirements for the purpose of creating jobs, thus: The alien

must have invested or be "actively in the process of investing" at least $ 1,000,000.00 in the new commercial enterprise, unless the investment is to be made in a "targeted employment area," in which case the investment must be at least $ 500,000.00.

6. Aliens could qualify for EB-5 preferred visa status by investing in a "regional center" and demonstrating by "reasonable methodologies" their compliance with the job creation requirements.

7. The immigration statute does not define "reasonable methodologies," but the minimum of ten full-time jobs may include "jobs which are estimated to have been created indirectly through revenues generated from increased exports."

8. An alien seeking to obtain lawful permanent residence in the United States under the EB-5 statute first must file an I-526 petition. If the I-526 petition is approved, the immigrant investor (as well as dependents, if any) is admitted for permanent residence on a conditional basis.

9. The immigrant investor must subsequently file an I-829 petition

-4-

to have the conditional status removed within ninety days of the second anniversary of his or her lawful admission for permanent residence.

10.    The EB-5 petition is granted if the Immigration and Naturalization Service ("INS") determines that the alien sustained the required investment and entrepreneurial activities during the period of his or her conditional residency.

11.    In 1998 a Hawaii limited partnership, 88 Piikoi Development Partners ("88 PDP"), was formed to develop and operate a condominium project located at 88 Piikoi Street,  Honolulu, Hawaii.

12.    88 PDP was managed by its general partner, Nauru Phosphate Development (Honolulu), Inc. ("NPRD").

13.    To raise capital for the project, NPRD, with the assistance of experienced immigration counsel, devised an investment plan that would allow alien investors to immigrate to the United States under the EB-5 immigrant investor program.

14.    Under the proposed investment plan's partnership agreement, an alien investor held "special distribution rights" that allowed

him to ask for the return of his investment and offered an alien

investor a "priority return" on his or her investment of 4 percent

per annum.

15.    The 88 PDP investment plan staged the immigrant investors'

investments so that final payment was not made until after the

EB-5 preference and visa had been obtained.  All immigrant

investors' investments were held in escrow until this final

contingency would have been met, thus making return of the

funds possible, without risk to the immigrant investors.

16.    At her first meeting with Defendant Ho, Ms. Nihei told him of

her interest in obtaining a visa that would permit her to remain

in the United States.

17.    Defendant Ho informed Ms. Nihei about the EB-5 program.

18.    Ms. Nihei told Defendant Ho that she did not want to start her

own business, and Defendant Ho said he would find an

investment opportunity for Ms. Nihei that would support an

EB-5 application.

19.    Defendant Ho subsequently introduced Ms. Nihei to

representatives of the 88 PDP project, and assisted Ms. Nihei in

completing a questionnaire in May 1998, indicating Ms. Nihei's interest in and desire to invest in the 88 PDP project.

20.    Defendant Ho took Ms. Nihei's completed questionnaire and informed Ms. Nihei that he would transmit it to an attorney representing the 88 PDP project.

21.    Defendant Ho informed Ms. Nihei that if she were accepted as an investor in the 88 PDP project, she would have to provide a deposit of $125,000.00.

22.    A few days later, Defendant Ho received a letter informing him that Ms. Nihei that had been accepted as an investor in the 88 PDP project.

23.    Defendant Ho presented Ms. Nihei with numerous documents and agreements regarding the 88 PDP project and directed her to sign them.  These documents included an offering memorandum, business plan, limited liability partnership agreement, escrow agreements, subscription agreements, subscriber's acknowledgment of documents and an investor's certificate.  All of these documents were presented to Ms. Nihei by Defendant Ho in his office, where Ms. Nihei signed them.

24.   At a subsequent meeting with Defendant Ho at his office, Ms. Nihei delivered the $125,000.00 deposit in the 88 PDP project to Defendant Ho.

25.   Defendant Ho understood at that time that the $125,000.00 was being deposited into an escrow account.

26.   Defendant Ho understood that, pursuant to the 88 PDP agreements, Ms. Nihei's $125,000.00 deposit in the 88 PDP project would be held in escrow until final approval of Ms. Nihei's EB-5 visa.  Defendant Ho further understood that if the EB-5 approval could not be obtained, Ms. Nihei's $125,000.00 deposit would be returned to her in full from the escrow account.

27.   On the same date Ms. Nihei paid $125,000.00 as her deposit for the project, Ms. Nihei signed the 88 PDP project retainer agreement with Defendant Ho.  Defendant Ho asked Ms. Nihei to sign the retainer agreement during their meeting.

28.   In the 88 PDP project retainer agreement between Ms. Nihei and Defendant Ho, Defendant Ho reserved the right to receive a referral fee for his referral of Ms. Nihei as an investor in the

88 PDP project, in addition to the $5,000.00 paid to him by Ms. Nihei.

29.     In the 88 PDP project retainer agreement between Ms. Nihei and Defendant Ho, Defendant Ho expressly stated he was not assuming any any liability for losses suffered as a result of Ms. Nihei's investment in the project.

30.     During the first four years of the immigrant investor program (fiscal years ("FY") 1992-95), the number of immigrant investor petitions ranged from 356 to 513.

31.     Beginning in FY 1996, the number of petitions began to rise sharply, increasing from 801 in FY 1996 to 1,290 in FY 1997, and then to 1,368 in FY 1998.

32.     The INS attributed the increase to the Immigrant Investor Pilot Program's liberalized standards and to marketing efforts overseas by American private sector promoters like 88 PDP.

33.     Many of the petitions did not set forth proposals by individual aliens to invest in businesses they would start up and run themselves.  Instead, numerous petitions reflected efforts by American organizations to recruit aliens to invest in them,

typically as limited partners.

34.   The American organizations proposed to use the aliens' capital
      in projects that would be controlled by persons other than the
      aliens.

35.   INS adjudicators approved some of these innovative
      applications.

36.   By late 1997, the INS had become aware that some of the EB-5
      petitions contained features that appeared to be contrary to the
      immigrant investor regulations. Pending a full review of the
      situation, the INS placed an administrative hold on all EB-5
      petitions with problematic features to prevent any more
      approvals that might be contrary to § 203(b)(5) and its
      regulations.

37.   In the summer of 1998, the Administrative Appeals Office
      ("AAO") of the INS published four Precedent Decisions
      addressing a number of the substantive issues that had arisen
      under the immigrant investor program: Matter of Soffici, 22 I.&
      N. Dec. __, 19 Immigr. Rep. B2-25 (Int. Dec. 3359, Assoc.
      Comm'r, Examinations June 25, 1998); Matter of Izumii, 22 I.

& N.Dec. __, 19 Immigr. Rep. B2-32 (Int. Dec. No. 3360,

Assoc. Comm'r, Examinations July 13, 1998); Matter of Ho, 22

I. & N. Dec.__, 19 Immigr. Rep. B2-99 (Int. Dec. 3362, Assoc.

Comm'r, Examinations July 31, 1998); and Matter of Hsiung,

22 I. &N. Dec. __, 19 Immigr. Rep. B2-106 (Int. Dec. 3361,

Assoc. Comm'r, Examinations, July 31, 1998).

38.   These Precedent Decisions were designated pursuant to

regulation to "serve as precedents in all proceedings involving

the same issue(s)." Except as these decisions may be modified or

overruled by later precedent decisions, they are binding on all

EB-5 applications.

39.   Following the issuance of the Precedent Decisions, the

immigrant investor petitions that had been subject to the

administrative hold were adjudicated under the guidance of the

Precedent Decisions.

40.   After the Precedent Decisions were issued, the immigrant

investors' investments in the 88 PDP project were returned, in

full, from the escrow account in which they were kept, with the

exception of two investors who had obtained approval of their

I-829 petitions.

41.  After the Precedent Decisions issued, the immigrant investors'

investments in 88 PDP, which included the guaranteed return

of the investments and 4 percent per annum, were returned to

the immigrant investors, including Ms. Nihei.

42.  Among the pending EB-5 applications affected by the

Precedent Decisions was that of Wanxuan Zou ("Zou").

43.  Zou's petition was denied under the Precedent Decisions

because, like the 88 PDP proposal, Zou could obtain return of

his investment within three years and there was a limitation of

4 percent per annum on the amount he could earn.

44.  Ho knew of Zou's EB-5 application, as Zou was represented by

Defendant Ho from the time of his initial application through

Defendant Ho's representation of him in United States District

Court for the District of Hawai'i.

45.  Therefore, in 1998 Defendant Ho was aware that INS frozen

EB-5 petitions and that Zou's petition was denied because, like

the 88 PDP investment, Zou held "special distribution rights"

that allowed him to ask for the return of his investment and

offered a "priority return" of 4 percent per annum under the proposed investment underlying his EB-5 application.

46.   On November 27, 1998, Defendant Ho filed a Complaint on behalf of Zou in the United States District Court, amended on June 17, 1999, alleging that the INS had abused its discretion and violated the Administrative Procedures Act, as well as the due process and equal protection clauses of the Constitution, by denying Zou's petition.

47.   At the time he filed the initial complaint the Federal District Court applied a very relaxed standard of review to the Precedent Decisions.

48.   Zou's claims were denied and the INS was granted summary judgment against him on all claims on January 28, 2000.

49.   Defendant Ho also was aware of similar class action litigation filed in 1999 in California, involving a large number of EB-5 applicants who had been granted I-526 conditional status but, before obtaining INS approval of the I-866 permanent status, had been put on indefinite administrative hold by the INS in 1998.   The plaintiff-class had sought relief from the U.S.

District Court similar to that of Zou, and had been denied such

relief which ultimately resulted in the appellate decision of

*Chang v. United States*, 327 F.3d 911 (9th Cir. 2003), with a

similar result–the INS denial of the petitions for the immigrant

investor Ms. Nihei's class was upheld.

50.    In or about August 1999, Ms. Nihei learned that her

investment in 88 PDP would be returned to her in full,

pursuant to the terms of the proposal.

51.    Ms. Nihei's investment in the 88 PDP project was repaid to her

on October 13, 1999.

52.    Defendant Ho did not inform Ms. Nihei that the 88 PDP

proposal was withdrawn because the INS would no longer

accept investments with redemption rights and earnings

limitations, like those proposed by 88 PDP, as the basis for an

EB-5 petition.

53.    Ms. Nihei was only told by Defendant Ho that her money was

being returned because the 88 PDP project was being

withdrawn.

54.    Ms. Nihei was not told by Defendant Ho that the INS had

frozen all EB-5 petitions to scrutinize them in 1997.

55.    Ms. Nihei was not told by Defendant Ho that the Precedent
Decisions were intended to prevent the type of investment
proposed by 88 PDP, with a guarantee of repayment with
interest, from being used as the basis for an EB-5 petition.

56.    Ms. Nihei was not told by Defendant Ho that he was actively
engaged in litigating the application and effect of the Precedent
Decisions, through Zou's case.

57.    Ms. Nihei's parents met with Defendant Ho and a Japanese
interpreter, prior to Ms. Nihei's investment in 88 PDP.

58.    Defendant Ho did not disclose to Ms. Nihei's parents that the
INS had frozen all EB-5 petitions to scrutinize them in 1997,
that the Precedent Decisions were intended to prevent the type
of investment proposed by 88 PDP from being used as the basis
for an EB-5 petition or that he was actively engaged in litigating
the application and effect of the Precedent Decisions through
Zou's case at the time he was proposing the 88 PDP investment
to his client, Ms. Nihei.

59.    Defendant Ho assured Ms. Nihei's parents he would "take care

of" their daughter and assist her in obtaining an EB-5

preference through a sound investment vehicle.

60.    After the 88 PDP project deposit was returned to her, Ms.

Nihei informed Defendant Ho that she wanted to pursue an

EB-5 visa through another investment.

61.    After she was refunded her investment from the 88 PDP

proposal, Defendant Ho told Ms. Nihei he would help her find

another project to serve as the basis for her EB-5 preference.

62.    Defendant Ho did not prepare or present a new retainer

agreement to Ms. Nihei.

63.    In late September or early October 1999, Defendant Ho

informed Ms. Nihei of a potential EB-5 investment in a project

with Sheldon Zane, involving a $500,000.00 investment in an

assisted living facility to be constructed on the Ewa plain.

64.    On behalf of Ms. Nihei, Defendant Ho arranged a meeting with

Sheldon Zane, Defendant Ho and Ms. Nihei, during which Ms.

Nihei and Defendant Ho were given a Business Plan by Sheldon

Zane.  The Business Plan purported to be for a new company

named "Kapolei Manor Eldercare, LLC."

65.    The Business Plan given to Ms. Nihei and Defendant Ho was, in fact, the Business Plan that had been created for Kapolei Eldercare, LLC, which stated that it had been approved by the State of Hawai'i as a project qualified under the United States "EB-5" alien investment program.

66.    Ms. Nihei did not know that the Business Plan was actually prepared for Kapolei Eldercare, LLC, not Kapolei Manor Eldercare, LLC.  Kapolei Manor Edlercare, LLC, however, was the investment actually being proposed to Ms. Nihei by Defendant Ho and Sheldon Zane, even though it was a company that did not even exist at that time.

67.    During this same meeting, Sheldon Zane told Ms. Nihei, while Defendant Ho was present, that construction on the Kapolei Manor Eldercare, LLC, project would begin by December 1999. Sheldon Zane further told Ms. Nihei, while Defendant Ho was present, that her investment monies would be kept in a separate account and used only for construction costs.

68.    Sheldon Zane represented to Ms. Nihei that if she invested in Kapolei Manor Eldercare, LLC and was unable to obtain an EB-

5 visa, Kapolei Manor Eldercare, LLC and/or its members would refund Ms. Nihei's investment of $500,000.00.

69.     Sheldon Zane first drafted the initial agreement whereby Ms. Nihei would be permitted to invest in Kapolei Manor Eldercare, LLC (the "Repurchase Agreement").

70.     Ms. Nihei will testify that Defendant Ho reviewed and made revisions to Sheldon Zane's draft of the Repurchase Agreement on behalf of Ms. Nihei.

71.     The Repurchase Agreement provides that in exchange for her investment of $500,000.00, Ms. Nihei will be given an 8% share in Kapolei Manor Eldercare, LLC.

72.     The Repurchase Agreement recognizes that Ms. Nihei was investing in Kapolei Manor Eldercare, LLC to qualify for permanent resident status as an EB-5 immigrant investor.

73.     The Repurchase Agreement further provides that, at Ms. Nihei's timely request, Kapolei Manor Eldercare, LLC and/or its members would repurchase Ms. Nihei's shares in Kapolei Manor Eldercare, LLC, six months after Ms. Nihei acquired permanent resident alien status in the United States.

74.    The Repurchase Agreement provides in Par. 6, that:

> *If Nihei is not successful in acquiring permanent*
> *resident status [under the EB-5 immigrant investor*
> *program], Kapolei LLC and/or its members will*
> *repurchase Nihei's investment for the same price she*
> *initially paid for her interest upon notice by Nihei that*
> *she desires to sell her shares.  Said notice must be given*
> *within one year from the time Nihei determines that*
> *she is not able to acquire permanent resident status.*

75.    Like the 88 PDP project, the Repurchase Agreement provided that Kapolei Manor Eldercare, LLC would repurchase Ms. Nihei's investment for the amount she paid–$500,000.00–within six months after she acquired permanent resident alien status, and, also, at any time she chose if she were to determine she would not succeed in obtaining the EB-5 visa.

76.    Defendant Ho was aware that the Kapolei Manor Eldercare, LLC Repurchase Agreement contained redemption and income limitations similar to those in the *Zou* case and the 88 PDP project, permitting Ms. Nihei to withdraw her investment and limiting her income to her original investment.

77.    On or about November 1, 1999, Ms. Nihei, Defendant Ho, Sheldon Zane and Wendy Pang met at Sheldon Zane's office.

At that meeting, Ms. Nihei and Sheldon Zane signed the Repurchase Agreement.

78. Subsequently, on November 1, 1999, Ms. Nihei executed an Operating Agreement for Kapolei Manor Eldercare, LLC, whereby she agreed to invest $500,000.00, in exchange for an 8% share in Kapolei Manor Eldercare, LLC.

79. On or about November 8, 1999, Ms. Nihei delivered a check to Sheldon Zane for $500,000.00, made payable to Kapolei Manor Eldercare, LLC.

80. On or about October 1999, Kapolei Eldercare, LLC, was in violation of the terms of its ground lease, as it had not yet begun construction as required in the lease.

81. During three or four meetings between Ms. Nihei, Defendant Ho, Sheldon Zane, and Wendy Pang, Defendant Ho was present when Sheldon Zane represented to Ms. Nihei that construction on Kapolei Manor Eldercare, LLC would begin by the end of December 1999.

82. Kapolei Manor Eldercare, LLC was merely a paper company, with no assets or plans; never conducted any business; and,

never started any construction for any development.

83.  Subsequently, Kapolei Manor Eldercare, LLC became
     completely insolvent, Ms. Nihei's entire $500,000.00 was lost to
     her and no EB-5 petition was ever filed.

84.  Ms. Nihei retained Defendant Ho because she did not have
     sufficient expertise or knowledge of investments to evaluate the
     88 PDP or Kapolei Manor Eldercare, LLC projects.

85.  English is not Ms. Nihei's native language and her only business
     experience in this country is as a customer service
     representative and tour guide.  Ms. Nihei has no experience in
     evaluating businesses and did not possess skills to determine if
     the Kapolei Manor Eldercare, LLC project would create the ten
     new jobs in the United States sufficient to support her EB-5
     petition.

86.  Defendant Ho attended all the meetings with Sheldon Zane
     and Wendy Pang at which the Kapolei Eldercare Manor, LLC
     project was discussed.

87.  Ms. Nihei believed that Defendant Ho was acting as her lawyer
     at all times and was advising her to invest first in 88 PDP and

then in Kapolei Manor Eldercare, LLC.

88.    Defendant Ho who had brought the investment to Ms. Nihei's attention and arranged and attended the meetings with Sheldon Zane.

89.    Defendant Ho admitted under oath that he did not have the skill or resources to determine whether the Kapolei Manor Eldercare, LLC project was legally or economically sound.

90.    Defendant Ho did not disclose his lack of skill and resources to Ms. Nihei at the time he was recommending the investment as a means for Ms. Nihei to obtain an EB-5 immigrant investor preference.

91.    Defendant Ho testified under oath that he is an expert in the EB-5 immigrant investor preference program and has submitted more applications than any other lawyer in Hawai'i.

92.    Defendant Ho testified under oath that he did not read the Kapolei Manor Eldercare, LLC Business Plan or determine its legal or economic viability despite the fact a copy of the Business Plan was given to him as Ms. Nihei's lawyer.

93.    When Defendant Ho attended the meetings with Sheldon

Zane and others, including Ms. Nihei, Defendant Ho was acting
as the lawyer for Ms. Nihei and was attending the meetings in
that capacity.

94.  Ms. Nihei believed that Defendant Ho was recommending the
Kapolei Manor Eldercare, LLC project because her investment
would satisfy the EB-5 immigrant investor requirements.

95.  Defendant Ho did not disclose to Ms. Nihei that her entire
investment had been lost and that she would not obtain the
EB-5 visa.  Ms. Nihei did not discover that she would not
obtain an EB-5 visa from her investment in the Kaoplei Manor
Eldercare, LLC project or that her entire $500,000.00
investment had been lost, until she retained a new attorney in
May 2003.

96.  After Ms. Nihei retained a new immigration attorney,
Defendant Ho ultimately returned a portion of the fee paid to
him by Ms. Nihei under the 88 PDP retainer agreement, but
kept $2,020.82 as a fee for services performed by him.

**E.    <u>DISPUTED FACTUAL ISSUES</u>.**

The three principal factual issues that are disputed are:

1.    That Defendant Ho advised Ms. Nihei of the INS position on EB-5 Petitions that included repurchase agreements prior to her investment in Kapolie Manor Eldercare, LLC.

2.    Ms. Nihei was informed by Mr. Ho that he was taking no steps to assure her investment would be held in escrow.

3.    Mr. Ho's conduct was consistent with other practitioners in the field who represented EB-5 Petitioners at the time of Ms. Nihei's investment.

**F.    RELIEF SOUGHT.**

Ms. Nihei seeks special and general damages in an amount sufficient to compensate her for her economic losses and severe emotional and physical distress she suffered as a result of Defendant's conduct.

**G.    POINTS OF LAW.**

HITMOMI NIHEI is pursuing the following claims for relief:

1.    <u>Duty to Inform Plaintiff</u>

An attorney who follows the requirements of the Hawai'i Rules of Professional Conduct must consult with and fully inform the client as to the means by which the objectives of the representation are to be pursued. *Finley v. Home Ins. Co.*, 90 Haw. 25, 33 (1998). Plaintiff alleges that Defendant failed to fulfill his obligation to keep her informed at all times. Ms. Nihei alleges she was not

informed or consulted as *Finley* and the Rules of Professional Conduct require.

2.    Violation of the Standard of Care.

Defendant's admissions, including his assertion that he regularly submitted applications to " find out whether and on what ground(s) the INS would deny it," are basically a confession that his actions were far below the standard of ordinary care. Ms. Nihei's expert will testify that Mr. Ho failed to meet his legal duty and fell below the standard of ordinary care. *Blair v. Ing,* 95 Haw. 247, 21 P.3d, 452, 464 (Haw. 2001); *Collins v. Greenstein,* 61 Haw. 26, 40, 595 P.2d 275, 283 (1979).

3.    Fraud.

The elements of fraud under Hawaii law are clear: (1) false representations made by the defendant; (2) with knowledge of their falsity (or without knowledge of their truth or falsity); (3) in contemplation of plaintiff's reliance upon them; and (4) plaintiff's detrimental reliance. *Hawaii's Thousand Friends v. Anderson,* 70 Haw. 276, 286, 768 P.2d 1293, 1301 (1989). All of these elements are present in the allegations contained in Ms. Nihei's complaint.

4.    Detrimental Reliance.

RESTATEMENT (SECOND) OF TORTS § 552 defines claims for

negligent misrepresentation.  That section provides:

> Information Negligently Supplied for the Guidance of Others.
>
> (1)  One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in  obtaining or communicating the information.

RESTATEMENT (SECOND) OF TORTS § 552 (1977).

Section 525 of the RESTATEMENT (SECOND) OF TORTS provides the general rule for fraudulent misrepresentation: "One who fraudulently makes a misrepresentation of fact, opinion, intention, or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation."

5.    Emotional Distress.

Hawai'i law recognizes an independent cause of action for infliction of emotional distress. *Rodrigues v. State*, 52 Haw. 156, 472 P.2d 509 (1970).  The elements of the tort recently were explained by the Hawai'i Supreme Court:

> [W]e adopt the approach set forth in the Restatement (Second) of Torts. In light of the substantial change in the law, we hold that. the elements of the tort of intentional

inflicton of emotional distress are 1) that the act allegedly causing the harm was intentional or reckless, 2) that the act was outrageous, and 3) that the act caused 4) extreme emotional distress to another.

*Hac v. University of Hawaii*, 102 Haw. 92, 106-07, 73 P.3d 46, 60-61 (2003).

Bodily injury is not a prerequisite to recovery. *Id.; Roes v. FHP, Inc.*, 91 Haw. 470, 985 P.2d 661 (1999) (fear of exposure to HIV sufficient to state a claim for emotional distress).

The Court has further explained:

[R]ecovery for intentional infliction of emotional distress is permitted only if the alleged tortfeasor's acts were "unreasonable." An act is "unreasonable" if it is "'without just cause or excuse and beyond all bounds of decency[.]'" In other words, the act complained of must be "outrageous," as that term is employed in the Restatement (Second) of Torts § 46 (1965).

*Ross v. Stouffer Hotel Co.*, 76 Haw. 454, 465-66, 879 P.2d 1037, 1048-49 (1994) (citations omitted).

6.    Breach of Contract.

Ms. Nihei asserts she employed Defendant Ho to present her with an investment opportunity which could be used to support her EB-5 application. Such an offer once accepted is binding according to its terms. *Kinoshita v. Canadian Pacific Airlines, Ltd.*, 68 Haw. 594, 601-03, 724 P.2d 110, 115-117 (1986).

H.    **PREVIOUS MOTIONS**.

The Court denied Ms. Nihei's motion for partial summary judgment, on December 19, 2005.

I.    **WITNESSES TO BE CALLED**.

Ms. Nihei intends to call the following witnesses and reserve the right to call witnesses listed in any party's pre-trial statement or supplement this list as appropriate:

| 1. | HITOMI NIHEI<br>c/o Carl M. Varady, Esq.<br>1001 Bishop Street, Suite 2870<br>Honolulu HI 96813 | Lay and percipient witness who will testify regarding liability and damages. |
|---|---|---|
| 2. | THOMAS T. M. HO, ESQ.<br>c/o Sam King, Jr.<br>735 Bishop Street, Suite 304<br>Honolulu HI 96813 | Lay and percipient witness who will testify regarding liability and damages. |
| 3. | D. SCOTT MACKINNON, ESQ.<br>P.O. Box 2800<br>Honolulu, HI 96813 | Plaintiff's investment in the 88 Piikoi Development Project, Defendant's representation of Plaintiff and all matters related thereto. |
| 4. | IRIS TACHIBANA,<br>3138 Waialae Ave.,<br>Honolulu, HI 96816 | Defendant's activities from 1999 through present, including the facts related to the instant action. |
| 5. | Custodian of Records of CITY BANK<br>201 Merchant Street, 12th Fl.<br>Honolulu, HI 96813 | Lay and percipient witness who will testify regarding liability and damages. |

| 6. | Custodian of Records of AMERICAN SAVINGS BANK P.O. Box 2300 Honolulu, HI 96804-2300 | Lay and percipient witness who will testify regarding liability and damages. |
|---|---|---|
| 7. | Custodian of Records of DEPARTMENT OF COMMERCE AND CONSUMER AFFAIRS, PROFESSIONAL AND VOCATIONAL LICENSING DIVISION P.O. Box 3469 Honolulu, HI 96801 | Lay and percipient witness who will testify regarding liability and damages. |
| 8. | Custodian of Records of THE ESTATE OF JAMES CAMPBELL 1001 Kamokila Boulevard Kapolei, HI 96707 | Lay and percipient witness who will testify regarding liability and damages. |
| 9. | DONNA GOTH c/o The Estate of James Campbell 1001 Kamokila Boulevard Kapolei, HI 96707 | Lay and percipient witness who will testify regarding liability and damages. |
| 10. | Custodian of Records of CASE BIGELOW & LOMBARDI Pacific Guardian Center, Mauka Tower 737 Bishop Street, Suite 2600 Honolulu, HI 96813 | Lay and percipient witness who will testify regarding liability and damages. |

| 11. | Custodian of Records McCORRISTON MILLER MUKAI MACKINNON P.O. Box 2800 Honolulu, HI 96803 | Lay and percipient witness who will testify regarding liability and damages. |
|---|---|---|
| 12. | Custodian of Records of 88 PIIKOI DEVELOPMENT PARTNERS c/o McCorriston Miller Mukai MacKinnon P.O. Box 2800 Honolulu, HI 96803 | Lay and percipient witness who will testify regarding liability and damages. |
| 13. | TETSUKO S. HO, 1833 Kalakaua Ave., #910, Honolulu HI 96815 | Defendant's activities from 1999 through present, including the facts related to the present case. |
| 14. | KAZUMI MURATA 796 Isenberg, Apt. 17G Honolulu, HI 96826 | Defendant's custom and practice in immigration matters. |
| 15. | TOSHIAKI TAKAHASHI, 2304 S. King St. Honolulu, HI 96826 | Defendant's course of practice in immigration matters in which Kyoiku Juku or other individuals known to Takahashi were involved. |
| 16. | SHELDON S.H. ZANE, ESQ., ASB Tower, Suite 1400, Honolulu HI 96813 | Facts pertaining to Plaintiff's claims against Defendant, and, without limitation, Defendant's participation in drafting the repurchase agreement. |
| 17. | WILLIAM C. LUM 1412 Kewalo St., Apt. 304 Honolulu, HI 96822 | Lay and percipient witness who will testify regarding liability and damages.. |

| 18. | Custodian of Records of CITY BANK 201 Merchant Street, 12th Fl. Honolulu, HI 96813 | Lay and percipient witness who will testify regarding liability and damages. |
|-----|---|---|
| 19. | JAMES HYRSYZIN, U.S. Dept. of Homeland Security, INS Honolulu, HI 96813 | Facts pertaining Defendant's knowledge, prior to 1999, regarding the qualifications necessary for investors making EB-5 visa applications. |
| 20. | STACY FUKUHARA, ESQ. 545 Queen Street, Suite 100, Honolulu HI 96813 | Defendant's representation of Plaintiff in her EB-5 application, and all facts pertaining thereto. |
| 21. | MARTIN LAWLER, ESQ. 201 Filbert Street, Suite 400 San Francisco CA 94133 | Expert who will testify regarding standard of care applicable to EB-5 matters. |
| 22. | ANN E. WILSON, CPA P.O. Box 198900, PMB 845 Hawi, HI 96719 | Expert who will testify regarding Ms. Nihei's financial losses. |

Additionally, Plaintiff may call all witnesses identified by Ms. Nihei or Defendant in disclosures, discovery responses or who have previously submitted testimony or sworn statements in this matter, as well as rebuttal and impeachment witnesses and custodians of records, who will testify as to the authenticity of certain records.

## J. <u>EXHIBITS, SCHEDULES & SUMMARIES</u>.

Ms. Nihei's intends to offer the following exhibits.

1.     The entirety of her immigration records, including the records produced by Defendant Ho, or summaries thereof.

2.     All records related to her investment in 88 PDP partnership or summaries thereof.

3.     All records related to Kapolei Manor Eldercare, LLC or summaries thereof.

4.     All records related to Kapolei Eldercare, LLC, or summaries thereof.

5.     Prior testimony, sworn statements or summaries thereof by any person offering such in this matter and any related case.

6.     The expert opinions of Martin Lawler, Esq.

7.     The expert opinions of Anne Wilson, CPA.

8.     The opinion in *R.L. Investment Ltd. Partners v. INS*, 86 F. Supp. 2d 1014 (D. Haw. 2000).

9.     Recorded statements from the Department of Homeland Security in which Defendant Ho reported to James Hyrsyzin and or others that attorney J. Matsumaru was engaged in alleged fraud involving EB-5 Petitions.

10.    Any exhibits identified, produced, referred to or otherwise disclosed by Defendant.

11.    Exhibits used for rebuttal or impeachment.

**K.    FURTHER DISCOVERY OR MOTIONS.**

Ms. Nihei anticipates that there will not be any further disputes concerning a planned but as-of-yet unscheduled discovery.

**L.    STIPULATIONS.**

Ms. Nihei anticipates stipulating to the authenticity of records and all prior testimony, sworn statements and related records.

**M.    AMENDMENTS OR DISMISSALS.**

None.

**N.    SETTLEMENT DISCUSSIONS.**

Ms. Nihei and Defendant been unable to engage in any meaningful settlement discussions.

**O.    AGREED STATEMENT.**

The parties should be able to agree to a statement of the case.

**P.    BIFURCATION.**

Bifurcation or separate trial are not appropriate.

**Q.    REFERENCE TO A MAGISTRATE JUDGE.**

Plaintiff is willing to consider trial to a Magistrate Judge.

**R.    APPOINTMENT AND LIMITATION OF EXPERTS.**

Ms. Nihei is offering expert testimony regarding liability from Martin

Lawler, Esq., and damages from Anne Wilson, CPA.  Defendant has disclosed

expert Ronald Oldenburg, Esq.

**S.    TRIAL.**

Trial to the Court is set for March 29, 2006, before the Hon. Helen

Gillmor.

**T.    TRIAL TIME.**

Ms. Nihei estimates trial will take 4 to 5 days.

**U.    CLAIMS OF PRIVILEGE OR WORK PRODUCT.**

None.

**V.    MISCELLANEOUS.**

The parties may seek a short trial continuance of 60 to 90 days.

DATED: Honolulu, Hawai'i, February _7_, 2006.

CARL M. VARADY

Attorney for Plaintiff
HITMOMI NIHEI

## CERTIFICATE OF SERVICE

I certify that a copy of the attached document was served by placing a copy in the United States mail first-class postage prepaid on the date indicated below, addressed to:

> Samuel King Jr., Esq.
> King & King
> Dillingham Transportation Bldg.
> 735 Bishop St., Ste. 304
> Honolulu, HI 96813

DATED: Honolulu, Hawai'i, February _____, 2006.

CARL M. VARADY